PUIG (SLEEPER v.).　See Cases Nos. 12,940 and 12,941.

PULASKI COUNTY (KINSEY v.).　See Case No. 7,830.

PULASKI COUNTY (SHIRK v.).　See Case No. 12,794.

PULASKI COUNTY (WHITWELL v.).　See Case No. 17,605.

---

## Case No. 11,461.

PULLAN v. CINCINNATI & C. AIR–LINE R. CO. et al.

[4 Biss. 35.] [1]

Circuit Court, D. Indiana.　June Term, 1865.

CORPORATE POWERS—POWER TO MORTGAGE FRANCHISES — ROLLING STOCK—WHEN INCLUDED IN MORTGAGE — PARTICULAR DESCRIPTION CONTROLS GENERAL TERMS—SPECIFICATION—WHEN EXCLUSIVE — PARTIES — INJUNCTION — WHEN GRANTED—APPOINTMENT OF RECEIVER.

1. A corporation has only such powers as its charter gives, either expressly, or as incident to its existence.

2. No corporation can mortgage its franchises without clear legislative authority to do so.　And authority to a railroad company to mortgage its "road, income, and other property," does not authorize a mortgage of its franchises.

3. Legislative authority to mortgage, includes the power to make a deed of trust in the nature of a mortgage.

4. A trust deed may be void in part, and valid in part.

5. A mortgage by a railroad company of "all the present and future-to-be-acquired property of the company, including the right of way and land occupied, and all rails, and other materials used therein or procured therefor," includes the rolling stock of the road.

6. Where a mortgage, in describing property, employs at first general terms, and afterwards proceeds to describe particularly each thing mortgaged, the latter will control the former, if there be a repugnancy.

[Cited in Calhoun v. Memphis & P. R. Co., Case No. 2,309.]

7. In a deed, specification generally excludes things not specified. But the omission to specify a thing, without which the things specified would be of no value, does not exclude it.

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

8. A railroad company having a general power to mortgage its road, may mortgage any part of it.

9. Purchasers pendente lite are not necessary parties to a bill in chancery. The judgment binds them, though they are not brought before the court.

10. A temporary injunction will be decreed, where without it great injury may happen to the complainant, and no injury can result from it to the defendant.

11. The appointment of a receiver is generally within the sound discretion of the court. But it is a power only to be exercised in strong cases. In no case of a mortgage ought a receiver to be appointed if it is clear that on a foreclosure the mortgaged property will bring enough money to pay the debt, interest, and cost.

[Cited in Union Mut. Life Ins. Co. v. Union Mills Plaster Co., 37 Fed. 291; Farmers' Loan & Trust Co. v. Kansas City, W. & N. W. R. Co., 53 Fed. 196; Pennsylvania Co., etc., v. Jacksonville. T. & K. W. Ry. Co., 5 C. C. A. 53, 55 Fed. 136.]

In equity.

John W. Grubbs. T. D. Lincoln, and J. P. Siddell, for complainant.

E. Walker and McDonald & Roach, for defendants.

McDONALD, District Judge. This is a bill filed by James Pullan against the Cincinnati and Chicago Air-line Railroad Company, and others. Pullan sues as a trustee for divers bondholders under a deed of trust in the nature of a mortgage.

The matter now before the court is a motion for a temporary injunction, and for the appointment of a receiver.

The facts and pleadings on which this motion is founded are substantially as follows: On the 16th of February, 1848, the legislature of Indiana enacted a charter authorizing a company to make a railroad from Richmond to New Castle, Indiana. The style of the corporation was the New Castle and Richmond Railroad Company, and the length of the road twenty-seven miles.

In January, 1851, the charter was amended so as to enable the company to extend their road either to the Indianapolis and Peru Railroad, or to the Lafayette and Indianapolis Railroad. This amendment also authorized the company to borrow money on mortgage of their "road, income, and other property."

To effect a loan of money for the completion of the road, the company issued coupon bonds to the amount of three hundred thousand dollars, dated February 25, 1852, payable February 25, 1867, with interest at seven per cent., payable semi-annually. The bonds were one thousand dollars each. To secure their payment a trust deed was executed by the company. By this trust deed, the company conveyed "all the present and in-future-to-be-acquired property of the said the New Castle and Richmond Railroad Company; that is to say: the first section of their road from Richmond to New Castle as

20 FED.CAS.—3

aforesaid, with the superstructure and all rails and other materials used therein, and all rights therein, tolls and income, and any rights thereto or interest therein, together with the tolls or income to be had or levied therefrom, and all franchises, rights, and privileges of the said the New Castle and Richmond Railroad Company of, in, to, or concerning the same." Such is the verbose language of the deed. It was made to Joseph B. Varnum and George Carlisle, and to the survivor of them, and to the heirs of such survivor, in trust that if the company should fail duly to pay either interest or principal on said bonds, the trustees might enter on and take possession of the mortgaged property, and use the same, and apply the proceeds of such use to the payment of the principal and interest of the bonds; and that, if it should become necessary, the trustees might sell the mortgaged property at auction and apply the proceeds to the payment of such principal and interest.

Carlisle, one of the trustees, died in March, 1863. And Varnum, the other trustee, becoming old and unwilling to perform the trust, the Wayne circuit court, in 1864, appointed the complainant, James Pullan, a trustee in the place of Carlisle.

The name of the company was, in April, 1853, changed to that of the Cincinnati, Logansport and Chicago Railway Company. And, in 1858, it was again changed to that of the Cincinnati and Chicago Railroad Company.

In April, 1853, the corporation executed to said Carlisle another mortgage in the nature of a deed of trust to secure the payment of other bonds. This mortgage was foreclosed in this court in 1860. It covered all the property of the company, which, under the decree of foreclosure, was sold by the proper officer to Choteau, Murdock, Schucharde. Thompson, and Morgan for thirty thousand dollars. These purchasers, in July, 1860, under an act of March 5, 1859, of the Indiana legislature, being the owners of said property, became a corporation under the style of the Cincinnati and Chicago Air-line Railroad Company.

This foreclosure and sale in no manner affected the rights of the bondholders under the deed of trust first aforesaid.

It appears that ever since said new organization, the defendant Judson has been president, and the defendant Tenny, secretary, and the defendant Morgan, treasurer, of the Cincinnati and Chicago Air-line Railroad Company.

It seems that, on the 16th of October, 1856, the last-named company attempted to lease to one John W. Wright and Company, for a term of ten years, all their property.

It appears also that the last-named railroad company has since attempted to consolidate with other railroad companies, both within and without the state of Indiana. But whether these doings were valid or not,

seems immaterial to the present case. Even since the commencement of this suit, there has been an attempt at consolidation, including the Cincinnati and Chicago Air-line Railroad Company, and several others, under the name of the Chicago and Great Eastern Railway Company.

It is conceded that the deed of trust and bonds first aforesaid form the first lien on so much of the road in question as lies between New Castle and Richmond; and that on these bonds no interest has been paid for about two years past.

Under the circumstances, the trustee, James Pullan, has filed his bill in equity to enforce the mortgage of February 25, 1852.

The bill, besides charging most of the facts above stated, alleges, inter alia, that the Cincinnati and Chicago Air-line Railroad Company, by their said purchase under judicial sale, took the road with the burden of said first mortgage bonds, and were bound to provide for the payment of the interest on them, but have neglected and refused to pay it; that for some time past, the earnings of the road have been large, and far above the current expense of running it; that the surplus earnings ought to have been, but were not, applied to the payment of said interest; that the same had been wrongfully applied in building a bridge across the Wabash at Logansport, beyond the terminus of the Cincinnati and Chicago Air-line Railroad, as it was located by the New Castle and Richmond Railroad Company, at the time when the first mortgage bonds were executed, and in building and completing another railroad, and furnishing it with rolling stock, and in buying up some of said first mortgage bonds on speculation and at reduced prices, and in discharging individual liabilities of the defendants, Judson, Tenny and Ripley; that the officers of the road have been permitted by the company to use corrupt and oppressive measures to force the holders of the bonds in question to exchange them at a sacrifice for other securities of the company; that the company are paying interest on certain sinking fund bonds issued by them at a later date than those represented by the complainant; that Judson and Tenny, officers of the company, threaten that unless the holders of the bonds of February 25, 1852, accede to certain terms proposed by the company, they will build a road parallel to so much of their road as lies between New Castle and Richmond and turn the business thereon so as to depreciate said security for said three hundred thousand dollars of bonds; that the officers of the company have, by false representations of the security for said bonds, greatly reduced their value in the market; that the company are making no provision for the payment of said interest; and that its officers refuse to permit either said trustees or the bondholders to examine the books of the company with a view to ascertain the amount and appropriation of its earnings. The bill prays an injunction against the building of said parallel road, and for a receiver, and for general relief.

The bill is sworn to.

The Cincinnati and Chicago Air-line Railroad Company have filed an answer supported by affidavit. This answer denies the power of the New Castle and Richmond Railroad Company to execute the trust deed and bonds in question; but it states facts in support of that denial. It denies any obligation on the part of the respondent to pay the interest on said bonds; but it admits that the company has all along received and appropriated the earnings of the road. It denies that said earnings have been misapplied, or applied towards the construction of said bridge across the Wabash, or for any purpose charged in the bill. It denies that the president and other officers of the company, "as such officers," have by threats endeavored to force the bondholders to surrender the bonds on any terms, or that, "as such officers," they have decried the value of the bonds, as charged in the bill.

The answer attempts to excuse the failure to pay the interest in question by stating that the company had offered to the holders of the bonds on which the interest had accrued, other bonds issued by them to the full amount of those on which said interest had accrued, if the holders would throw off the interest, and alleging that all the earnings had been expended in improving and repairing the road and providing the necessary rolling stock, &c., to run it.

The answer also states that under the laws of Indiana and Illinois, the railroad leading from Richmond to Logansport and the "Chicago and Great Eastern Railway" were consolidated, and that these now form one continuous line of two hundred and twenty-four miles from Richmond to Chicago.

Whether it is claimed that these two form now one body corporate, is not clearly stated. If such a consolidation is meant to be claimed, I do not see how the thing could be effected under the rulings of the supreme court in the case of the Ohio & M. R. Co. v. Wheeler, 1 Black [66 U. S.] 286. I suppose that a consolidation for running arrangements between roads in different states may be lawful. But I suppose that two railroad corporations of different states can not be consolidated into one new corporation.

The complainant now moves for the appointment of a receiver and for an injunction. Affidavits and other documents have been filed, both in support of this motion and in opposition to it; and very able and exhaustive arguments have been made on both sides of the question.

Several preliminary points arise on this motion, which it may be well first to notice.

1. It is contended that the New Castle and Richmond Railroad Company had no power to make the trust deed in question.

I recognize the rule that a corporation "possesses only those properties which the charter

of its creation confers upon it, either expressly, or as incident to its very existence." Head v. Providence Ins. Co., 2 Cranch [66 U. S.] 127; Beaty v. Knowler, 4 Pet. [29 U. S.] 152; Trustees of Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 518, 636; Jefferson Branch Bank v. Skelly, 1 Black [66 U. S.] 436.

Under the Indiana constitution, every statute is a public law of which the courts must take official notice, unless it is otherwise declared in the statute itself. Article 4, § 27. I must therefore, ex-officio, take notice of the charter powers of the New Castle and Richmond Railroad Company, though its charter is neither pleaded nor proved. So it is decided in the case of Covington Drawbridge Co. v. Shepherd, 20 How. [61 U. S.] 227, though a contrary doctrine is held in Charleston & J. Turnpike Co. v. Willey, 16 Ind. 35.

The original charter provided that the company might "negotiate any loan or loans of money at any rate of interest deemed expedient," and that "the principal and interest of all debts so contracted shall be a lien, in their order, on all property and effects of the company." And the amendment to the charter provided that, for constructing and equipping the road, the company might borrow money, issue its bonds or notes therefor, and, to secure the same, mortgage its "road, income, and other property." Undoubtedly here is a power to make a deed of trust in the nature of a mortgage.

But it is said that the deed of trust in this case undertakes to mortgage the company's franchises; and that the charter gives no power to do that. It is true that the deed does attempt to mortgage, among other things, "all franchises, rights and privileges" of the company. And it seems to be well established that no corporation can, without express legislative authority, either sell or mortgage its franchises. The charter, indeed, empowers the company to mortgage its "road, income and other property;" and this language is equivalent to authority to mortgage all the company's property. Franchises are, in some sense, property; and it may thus be plausibly argued, that power to mortgage all property is, therefore, power to mortgage all franchises. I think, however, that the argument is not sound; and that this deed of trust, so far as it attempts to mortgage franchises, is void.

But it does not follow that the deed is void as to the mortgage of the road itself, and its tolls, income, and real estate. In my opinion the mortgage is valid as to these. And whatever may be said of the franchises is quite unimportant to the present motion, since, if it be even allowed to any extent, it certainly would be rash, and improper, and useless to turn over the franchises to a receiver.

2. It is contended that, at most, this deed of trust only embraces so much of the road as lies between New Castle and Richmond, and the tolls and income arising therefrom, and that it does not embrace any rolling stock.

By the language of the deed, it seems to me obvious that only such portion of the road as lies between those two points, with the "bridges, depots," and other things thereon, and the tolls and income arising therefrom, are mortgaged. I can not conceive that any part of the road or its fixtures, situate between New Castle and Logansport, is touched by the mortgage. I think that without a deed of trust, the original charter would have made this three hundred thousand dollars a lien on the whole road and on all its fixtures and other property. But the creditors having elected to take the security which this deed of trust gives, must, perhaps, be deemed to have waived the lien given by the original charter,—especially so, as the bill in this case makes said deed the foundation of the present action.

Whether by this instrument any rolling stock at all is mortgaged, is a more difficult question. The tolls and income are expressly mortgaged. Without rolling stock, there could be neither tolls nor income. Now it is a maxim that whosoever grants a thing is supposed also tacitly to grant that without which the grant itself would be of no effect. "Cuicunque aliquis quid concedit, concedere videtur, et id sine quo res ipsa esse non potuit." Liford's Case, 11 Coke, 52; Broom, Leg. Max. 464.

In my opinion the spirit of this maxim ought to be applied to the point in question. The description of the mortgaged property is at first in general terms, thus: "All the present and in-future-to-be-acquired property" of the company. Then it proceeds to specify, —"That is to say: the first section of their road from Richmond to New Castle, including the right of way and land occupied thereby from Richmond to New Castle as aforesaid, with the superstructure, and all rails and other materials used therein or procured therefor, bridges, viaducts, culverts, fences, depot grounds and buildings erected thereon, and all rights therein, tolls and income,—any rights thereto and interest therein,—together with the tolls or income to be had or levied therefrom." I agree with defendant's counsel that the first general statement in this description is controlled and limited by the subsequent specific description in which rolling stock is not even mentioned; and that "expressio unius est exclusio alterius." But I think that the omission to specify a thing along with other things which are enumerated, does not exclude it, if any of the enumerated things could be of no use without it. And that seems to me to be the case here. None of the things specified could be of much value to the mortgagees without the rolling stock. On a foreclosure, the lands, superstructures and fixtures might, indeed, be sold; but the tolls and income could not be. Besides, the deed of trust provides another remedy to the mortgagees in case of a default

by the mortgagors,—the very remedy which the complainant is now seeking through a receiver. It provides that in case of a default, the trustees may enter and take possession of the mortgaged property, and use and operate the same, and apply the proceeds thereof to the payment of the interest and principal of the bonds intended to be secured by the mortgage. Now, in pursuing this remedy, of what avail would all the other property be if the rolling stock cannot be used? Nay, could the remedy be pursued at all without the use of the rolling stock? The reason of the rule that when a man grants a tract of land in the center of a larger tract owned by him, he also grants, by implication, a right of way into it, fully applies to the case in question; and it strongly applies to the mortgage of tolls and income. It is truly said by Mr. Justice Twisden, that "when the use of a thing is granted, every thing is granted by which the grantee may have and enjoy such use." Pomfret v. Ricroft, 1 Saund. 321. And Mr. Justice Story approves and adopts this language in the case of Charles River Bridge v. Warren Bridge, 11 Pet. [36 U. S.] 629. So in Whitney v. Olney [Case No. 17,-595], an analogous principle is sustained. It was there held that the devise of a mill, eo nomine, carried with it the mill-yard so far as the same was necessary to the use of the mill. A like doctrine is maintained in Blaine v. Chambers, 1 Serg. & R. 169, and in Common Council of Richmond v. State, 5 Ind. 334.

If it be said that the present is the case of a mortgage, and not of a grant or devise like the cases just cited, it may well be answered that the reason is the same in them all, and therefore the rule ought to be the same.

I am of opinion that, at least so far as concerns the present motion for a receiver, the rolling stock ought to be regarded as being reached by the mortgage. If this case ever comes to a decree of foreclosure, it will then perhaps be the proper time to determine whether this is so far a mortgage of any rolling stock as to justify the court in ordering its sale. And, as a final determination of the point is unimportant to the pending motion, as I view it, the question is left open for argument on the final hearing.

3. It is argued that this deed of trust is void, because the company had no power to mortgage its road in parcels as was here attempted. I think the power to mortgage the whole road, manifestly given in the charter, necessarily gives the power to mortgage any part of it. This power, I think, would exist without express legislation, as the power to contract is incident to the very existence of such a corporation. Besides, the second mortgage and the judgment of foreclosure on it expressly recognize the validity of this deed of trust. The defendants hold the road under a sale to them on this judgment; and they are therefore estopped to deny the validity of this deed of trust. Bronson v. La Crosse R. Co., 2 Wall. [69 U. S.] 283.

4. It is objected that, as the Chicago and Great Eastern Railroad Company has, since the commencement of this suit, by consolidating with the Cincinnati and Chicago Air-line Company, become interested in the subject of this litigation, the former company ought to be made a party to it. Volunteers who become interested pendente lite are not necessary parties. Without being brought into court, the judgment binds them. Story, Eq. Pl. §§ 156, 351.

Let us now proceed to inquire whether, upon the case made, an injunction and a receiver ought to be ordered.

I. As to a temporary injunction.

We have seen that, according to the bill, the defendants have threatened that unless the bondholders submit to certain oppressive terms, that portion of the road lying between Richmond and New Castle "shall be practically cut off" from the residue of the line, "by the construction of a road from New Castle to Connersville, Indiana, by which the whole business upon the road above New Castle shall and will be diverted from the part of the road from New Castle to Richmond." And the bill charges that the defendants are secretly aiding and encouraging the building of such road for such purpose.

The answer denies that the officers of the company, "as such officers of said company," have made the threats charged; and it especially denies "that any threats have been made by the defendant, or by any one authorized to speak in behalf of this defendant (the company); that if the said parties represented by the complainant would not take the bonds issued under the mortgage issued by this defendant in exchange for the bonds so held by said parties, that this defendant would construct a road from New Castle to Connersville, Indiana, and practically cut off that part of the road upon which the complainant claims that the said mortgage rests;" but the answer, nevertheless, claims in substance that the company may lawfully do so if they please. Whether the company intends to do so, is not stated in the answer. These denials in the answer are very carefully guarded. They look so much like a negative pregnant that they naturally raise in my mind some suspicion; and taking this circumstance together with the affidavits filed on both sides, I think it fair to conclude that the threat has been made in substance, and that the complainant has just ground to fear that it may be carried out. I shall therefore order the temporary injunction. And I do this with the less hesitation, since, if the company and its officers have no such design, the order can do them no harm, and since, in my opinion, the defendants are grossly mistaken in affirming in their answer that they have a right to do what the threat imports, if they please. To me it appears that any attempt to divert business from the road between

New Castle and Richmond would, under the circumstances of this case, be most unjust and inequitable.

II. Let us next inquire how the case stands on the motion for a receiver.

The power of courts of chancery to appoint receivers is a discretionary power, to be exercised with great caution. Railroad Co. v. Soutter, 2 Wall. [69 U. S.] 510.

To dispossess the owner of property of its possession before a final hearing, is a strong measure, not to be adopted but in a strong case. I think it should never be done unless, without it, the complainant would be in danger of suffering irreparable loss.

Is the present such a case?

The bill charges that no interest on the bonds in question has been paid for about ten years past; and the answer admits this allegation. This of itself is a very strong circumstance in favor of the motion. These are first mortgage bonds, and have precedence of all other liens on the company's property; and it is startling to find so long a delay to pay interest. At first blush it would raise the suspicion that the owners of the road had been very unfortunate, or very reckless, or very unmindful of their duty. The fact that the property mortgaged has changed hands once or twice since the bonds were executed does not tend to remove that suspicion. The new owners took the property cum onere, and ought, if they could, to pay the interest. In the case of Williamson v. New Albany, etc., R. Co. [Case No. 17,753], in October, 1857, before Judge McLean, it appeared, on a motion like the present, that the defendant had failed to pay the semi-annual interest which fell due in April, 1857. And principally, if not solely, for that single and recent failure, the chancellor, while in form he overruled the motion for a receiver, did what was nearly equivalent to appointing one: he placed the road so far under the control of the court, as to require that company to make monthly reports to the court of the net income of the road and to pay a certain proportion thereof into court every month for the use of the bondholders.

Another important fact established in the case at bar, is that the trustee, Varnum, as also some of the bondholders, on several occasions applied to the president of the company for leave to examine their records, with a view to the amount of the company's income and to the disposition made of it. This application the president at first evaded and finally denied. He said he would not give the bondholders a club to break his own head with, and denied that the trustee was the proper person to make the application. This response can not be justified. Of all men, the trustee, in the discharge of his duty, was the proper person to make the examination asked. It was not only his right, but his duty, to make it; and the president's letter denying him the privilege was unjustifiable. If the company's records were honest and fair, and if they meant to deal righteously by the trustee and

bondholders, and had really done so, it is difficult to see how the information sought could be "a stick to break anybody's head with." To persons thus withholding necessary and proper information, courts will apply the maxim, "Omnia præsumuntur contra spoliatorem."

The answer, too, is in some respects a little evasive. In attempting to meet the charge of threats and of attempts to decry the value of the bonds in the market, it cautiously and guardedly denies that the company's officers, "as such officers" have done these things. To do so could hardly, under any circumstances, be official acts.

The attempt, in the defendant's answer and affidavits, to excuse the non-payment of the interest in question, I think is entitled to little weight. Even honest inability to pay a debt is a poor excuse when one is sued for it. But here, as it seems to me, a still poorer excuse is attempted by averments that the company have had to provide for other roads with which they have in some way consolidated, and, to effect this, have expended and must expend large sums of money,—matters with which the bondholders have nothing to do. Thus it is urged (by way of excuse, I suppose) that the company, at great expense, in 1861, had constructed an addition to their road from Logansport to Valparaiso; that to stock their road thus extending from Richmond to Valparaiso, they purchased rolling stock to the value of three hundred and seventy thousand dollars; that afterwards a still more important extension of the road was effected, so as to make a continuous line to Chicago by a union with other roads, at a cost of about one million five hundred thousand dollars; and that to equip this long road, as it must be equipped, will cost about one million five hundred thousand dollars more. Here, then, is an aggregate of about three million three hundred and seventy thousand dollars with which the different companies succeeding to the ownership of the New Castle and Richmond Railroad have burdened themselves. And by the answer it seems to be implied that this furnishes some excuse why the interest in question remains unpaid, or at least why a receiver should not be appointed. To my mind this is no excuse. Whatever the air-line road did in this regard, was done at its risk; and if by assuming such burdens, it became the less able to pay the interest, this is, I think, one reason for appointing a receiver.

But the most remarkable feature in the answer, as it seems to me, is, that it does not, that I can see, present any feasible scheme for paying this interest at all. Indeed, so far as appears from the answer, it does not seem that the interest will ever be paid voluntarily. A strong desire is evinced to extend the road and raise vast sums for equipping it; but no corresponding anxiety is shown to do anything for the first mortgage bondholders. The answer evidently evinces a design to postpone this matter till the very last.

Under all the circumstances, I think the appointment of a receiver would be very

proper, if the bill had averred that the mortgaged property was not a sufficient security for the debt; and that, without a receiver, the bondholders are in danger of irreparable injury. I suppose that in no case of a mortgage ought a court of chancery to appoint a receiver, if the mortgaged property is of such value as to render it clear that, on a foreclosure and sale, the debt could all be made. In the present case, the mortgaged property would probably not bring so much on sale.

I will therefore appoint a receiver, whose duty it shall be to examine the books and affairs of the road, to ascertain its net earnings monthly, to receive one-fourth of the net earnings of the road from Richmond to Logansport from the company every month, and to pay it into this court for the use of the bondholders. And I order that the company, its officers and agents, give to such receiver all proper facilities for examining the books and papers of the company touching the gross and net incomes and earnings of said part of said road; and that the company, by their proper officer or officers, do under oath render full and fair monthly statements to such receiver of the gross and net income and earnings of said part of said road, and pay over to him every month said fourth part of said net proceeds.

NOTE. For opinions in this case, consult Bill v. New Albany, etc., R. Co. [Case No. 1,407], and Pullan v. Cincinnati & C. Air-Line R. Co. [Id. 11,462]. See further, that a corporation can only exercise such powers as are conferred or such as are necessary to carry into effect those expressly delegated. City of Chicago v. Rumpff, 45 Ill. 90. A railroad's deed of trust operates as a mortgage. Coe v. Johnson, 18 Ind. 218. That a corporation has no power to mortgage its franchise, without express legislative authority, see Coe v. Columbus, P. & I. R. Co., 10 Ohio St. 372; Com. v. Smith, 10 Allen, 448. Generally, assignees or purchasers pendente lite need not be made parties, and are bound by the proceedings. 1 Daniell, Ch. Pl. & Prac. 280, and note 7, where there is a large collection of authorities. For a collection of authorities on the proposition that the appointment of a receiver is discretionary with the court, see 2 Daniell, Ch. Pl. & Prac. 1715, and notes et seq.